IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RHEANNA J. B.[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No. 22-cv-2948-RJD[2] |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM and ORDER

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI on November 20, 2019, alleging a disability onset date of September 1, 2019.  (Tr. 277-279, 280-288).  After holding an evidentiary hearing, the Administrative Law Judge (ALJ) denied the application on February 25, 2022.  (Tr. 21-48).  The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review.  (Tr. 274-276, 12-17).  Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.   See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  (Doc. 9).

1

**Issues Raised by Plaintiff**

Plaintiff raises the following issues:

1. Did the ALJ comply with the requirements of SSR 16-3p in the evaluation of Plaintiff's subjective reports regarding her gastrointestinal impairments?

2. Did the ALJ comply with the regulations and support with substantial evidence her assessment that Dr. Datta's medical opinion was unpersuasive?

**Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3]   Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work?   20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled.   A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4.   Once the plaintiff shows an inability to

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Importantly, the Court's scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. She determined that Plaintiff had not engaged in substantial gainful activity since September 1, 2019, the alleged onset date. (Tr. 27). The ALJ found that Plaintiff suffered from severe impairments of Type I Diabetes; generalized anxiety disorder; major depressive disorder; marijuana abuse; post-

3

traumatic stress disorder ("PTSD"); and gastritis.   (Tr. 27).   The ALJ also concluded that

Plaintiff's impairments did not meet or equal a listed impairment.   (Tr. 28).   Next, the ALJ noted

the RFC stating:

> [A]fter careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except she cannot climb ladders, ropes, or scaffolds
> but can occasionally climb ramps and stairs.   She can perform frequent balancing
> on narrow, slippery, or erratically moving surfaces and can perform tasks requiring
> frequent operation of foot controls bilaterally.   The claimant cannot work at
> unprotected heights or around moving mechanical parts or other such hazards.   She
> cannot perform work involving vibration, such as would be required by the
> operation of heavy equipment drills, jackhammers, or other such devices.   She can
> maintain the concentration required to perform simple routine tasks, remember
> work procedures, and make simple work-related decisions.   The claimant cannot
> work at a fast pace such as an assembly line but can stay on task and meet
> reasonable production requirements in an environment that allows her to maintain
> a flexible and goal-oriented pace.   She is limited to work that requires only
> occasional changes in the work setting which are introduced gradually.   The
> claimant can have occasional interaction with co-workers and supervisors but no
> public interaction.   She cannot perform work that requires the use of public
> transportation.

(Tr. 31).   The ALJ then relied on the vocational expert's testimony to conclude that

Plaintiff was not disabled and could work as (1) a routing clerk, (2) a folding machine

operator, and (3) a cleaner, housekeeper.   (Tr. 40).

Plaintiff's first arguments focus on her subjective reports of nausea and vomiting.   The

ALJ assessed Plaintiff's subjective reports as follows:

> As for the claimant's statements about the intensity, persistence, and limiting
> effects of her symptoms, they are inconsistent with the objective evidence
> contained in the entire case record, the statements and other information provided
> by medical sources and others, as well as the relevant evidence in the claimant's
> case record, including but not limited to the claimant's reports of activities of daily
> living, measures taken to alleviate her symptoms, and the location, duration,
> frequency, and intensity of her symptoms (see 20 CFR 404.1529 and 416.929).

As noted above, the claimant's vision and GERD (the latter of which caused nausea but was treated with medication) are non-severe impairments and have been addressed.   However, I have addressed the claimant's nausea in the decision below as it could be related to her symptoms of gastritis.

. . .

In regard to her gastritis, the claimant reported significant nausea and vomiting in September of 2019 (Exhibit 6F/7), but by the next month, stated that her symptoms were greatly improved and stable after making modifications to her diet (Exhibit 6F/13).   After reporting persistent diarrhea in December of 2019 (Exhibit 3F/22), the claimant underwent a colonoscopy which showed no abnormalities (Exhibit 3F/24) and was diagnosed with gastroenteritis (Exhibit 3F/23).   A gastroenterologist prescribed her Viberzi (Exhibit 4F/3).

The claimant claimed she experienced projectile vomiting three times per week in January of 2021 (Exhibit 14F/1); her doctor diagnosed her with GERD and prescribed medication (Exhibit 14F/6), which improved her vomiting and heartburn (Exhibits 17F/3, 20F/1).   The claimant noted some nausea and no vomiting by March of 2021 (Exhibit 19F/1), and an upper GI was negative (Exhibit 33F/33). However, her claims of nausea (and a brief bout of vomiting) had returned by September of 2021 after she stopped taking Omeprazole (Exhibit 33F/3).   The claimant's primary care provider resumed her prescription of Omeprazole (Exhibit 33F/7), and her symptoms were again stable in November of 2021 (Exhibit 37F/5).

. . .

Additionally, medication has improved the claimant's symptoms of nausea per her own report, and a colonoscopy and upper GI were normal.

(Tr. 32-33, 35).

Plaintiff's second argument challenges the ALJ's assessment of the medical opinion of

Plaintiff's psychiatrist, Dr. Gautam Datta, M.D., for which the ALJ noted:

Gautam Datta, M.D., the claimant's psychiatrist, completed a Mental Medical Source Statement in August of 2021 (Exhibit 35F).   In this statement, he noted that she would miss four days of work per month and would be off task 25% of the time (Exhibit 35F/4).   Notations also reflect that she had predominately marked or extreme limitations in her "B" criteria areas, though the less restrictive answer in almost every area was also marked, then struck through (Exhibit 35F/4-5). There is no indication on the form as to the reason for these multiple changes.   In any event, I do not find this statement to be persuasive, as the marked and extreme limitations noted are not supported by Dr. Datta's own records of the claimant's treatment

5

(Exhibit 39F), and is not consistent with the medical evidence as a whole, which shows that the claimant's mental status examinations were predominately normal but for mild mood and affect symptoms (Exhibits 5E, 3F/1, 6, 10, 5F/5, 11-12, 28, 6F/4, 10, 16, 21, 14F/4, 18F/3, 19F/2, 20F/15, 20, 26, 21F/4-5, 28F/4, 29F/33, 30F/2, 31F/10, 29, 36F/8, 15, 38F/5).   These examinations showed mild symptoms, and while the claimant has described herself as isolated (Hearing Testimony), she was cooperative with treatment providers, was able to explain her symptoms, participated in her medical care, interacted with family and at least one friend (Exhibits 5E/5, 1F/3, 8, 2F/2, 3, 5F/5, 6, 6F/19, 21, 7F/21, 14F/4, 16F/1, 19F/2, 7, 11, 20F/15, 21F/7, 22F/2, 28F/23, 29F/11, 33, 57, 30F/2, 5, 9, 33F/28, 36F, 37F/8, 100, 151, 39F/13, 18, 47, 48).   Therefore, a finding that the claimant has no more than moderate limitations in her "B" criteria is supported.   I have duly accommodated the limitations supported in the file in the residual functional capacity.

(Tr. 38-39).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by Plaintiff.

### 1.      Agency Forms

Plaintiff was born in 1995 and was 24 years old on the date of the ALJ's decision.   (Tr. 39, 280).

In her Function Report, the claimant alleged that she has issues with memory, but not with understanding or following instructions, though she did note that she does not follow spoken instructions very well due to trouble remembering them.   (Tr. 341)

### 2.      Evidentiary Hearing

Plaintiff appeared and testified by phone at a hearing held on December 28, 2021, before the ALJ, being represented by counsel.   (Tr. 24).   Plaintiff testified that "I've had persistent nausea since middle school[, b]ut since other symptoms started developing, nausea progressed into

6

vomiting…eventually progressed into multiple times a day…it makes it a lot more difficult to manage diabetes." (Tr. 60). Regarding her bouts of vomiting, Plaintiff noted that she used to vomit every day, but since she started taking medications and stopped working, these episodes had been reduced to probably three days per month. (Tr. 64-65). Plaintiff explained that during the bouts of vomiting, she would not be "leaving the bathroom that day." (Tr. 65).

Plaintiff went on to explain that she has been diagnosed with PTSD, bipolar, anxiety, and depression. (Tr. 60). She explained that her anxiety makes her feel "shaky, [paranoid,] and [unable to] concentrate." (Tr. 65). While her prescription of Zoloft has helped with some of her anxiety symptoms, she "will pull [her] hair out sometimes, and [she] can't talk to people when it's like that." (Tr. 66). She testified that she had daily mood swings that made her experience anger and sadness. (Tr. 66).

A vocational expert (VE) also testified. The VE testified that a person with Plaintiff's RFC assessment could work as (1) a routing clerk, (2) a folding machine operator, and (3) a cleaner, housekeeper. (Tr. 40).

### 3. Relevant Medical Records

On September 4, 2019, Plaintiff reported to Corinne Murphy, PA-C, for nausea and vomiting for nine months. (Tr. 547). She explained she had changed her diet to a diabetic gastroparesis diet recommended by Mayo. (Tr. 547). She noted that smoking marijuana before meals would resolve her nausea and vomiting, with the symptoms recurring when she would not smoke before meals. (Tr. 547). She further noted that she had started Zoloft medication in March, which increased her nausea, but she returned to "baseline nausea" after three weeks. (Tr. 547).

7

On September 6, 2019, Plaintiff visited Sanjay Nigam, M.D., and reported concerns about her lethargy, muscle aches, anxiety, sleep disturbances, and nausea.  (Tr. 423).  Dr. Nigam discussed the goal of treating Plaintiff's major depressive disorder.  First, the treatment plan was the prescription of an SSRI.  (Tr. 424).

On October 3, 2019, Plaintiff visited Michael Barajas, P.A.  Plaintiff voiced concerns about unspecified vomiting and nausea, major depressive disorder, and Type 1 Diabetes.  (Tr. 553).  Plaintiff reported that she had adjusted her diet based on recommendations from Mayo Clinic for gastroparesis, which greatly improved her symptoms, and further explained that she was not concerned about being referred to GI because her symptoms were stable.  (Tr. 553).   PA Barajas assessed that Plaintiff was experiencing a mild episode of recurrent major depressive disorder, which was uncontrolled.  (Tr. 557).  He contacted Dr. Nigam about increasing her prescription of Zoloft and noted that the prescription of Alprazolam needed to be refilled again. (Tr. 555-557).

On October 25, 2019, Plaintiff was sent to Gateway Hospital for a psychological examination after she was having suicidal thoughts and ideation.  (Tr. 435).  She presented with angry behavior/mood.  (Tr. 438).  She was discharged home with a diagnosis of major depressive disorder, single episode.  (Tr. 440).

Plaintiff presented to Ronald Gould, M.D., on December 4, 2019, for persistent diarrhea with some blood in her stools.  (Tr. 474).  She was diagnosed with noninfective gastroenteritis and colitis.  (Tr. 475).  A colonoscopy with a biopsy was performed on the same day.  (Tr. 476). In the report of the colonoscopy, Dr. Gould noted in his findings that "[t]he colon was examined and no abnormalities were seen."  (Tr. 476).  At the biopsy report, Dr. Gould made the following

findings: "nonspecific mild chronic colitis, mildly reactive collateral mucosa with mild chronic inflammation and intramucosal edema, and a few eosinophils in the inflammation." (Tr. 479). In his pathology report, Dr. Gould listed as Plaintiff's final diagnosis "RANDOM COLON, ENDOSCOPIC BIOPSY: - NONSPECIFIC MILD CHRONIC COLITIS." (Tr. 492). In a letter regarding those findings, Dr. Gould noted that the colonoscopy "revealed no gross abnormalities and biopsies were negative for any classic form of microscopic colitis, showing only some mild nonspecific inflammation." (Tr. 491). Dr. Gould added to the letter: "I should add that when I performed her colonoscopy, she mentioned that she is more concerned about her nausea than anything else. Actually she had only mentioned that briefly when I saw her in the office. At any rate, if those symptoms persist, I will consider testing for H. pylori or perhaps an ultrasound or EGD." (Tr. 491).

On January 12, 2019, Plaintiff presented again to PA Barajas where she reported that she was doing better, she was making new friends, and was talking with her family more which was helpful. (Tr. 559). She reported that she continues to use marijuana to suppress nausea and vomiting. (Tr. 559). Despite reporting anxiety, depression, and paranoia, PA Barajas found her psychiatric examination grossly normal but for anxious mood. (Tr. 560, 561).

On January 25, 2021, Plaintiff visited her primary care provider, Amy Britt, NP. (Tr. 631). At that visit, Plaintiff recounted increasing nausea for the past four years. (Tr. 631). Her nausea caused projectile vomiting three times a week. (Tr. 631). Plaintiff stated that these symptoms would worsen at night when she lay down. Britt prescribed Plaintiff Omeprazole. (Tr. 636).

On February 25, 2021, Plaintiff visited treating provider Nueki Naate, M.D., for additional concerns about her anxiety disorder. Dr. Naate prescribed Buspirone. (Tr. 758). On March 3,

2021, Plaintiff visited Kathy Liefer, N.P., a gastroenterologist.  (Tr. 676).   Plaintiff explained concern about her projectile vomiting 3 times a week and her gastric reflux once again.  (Tr. 676). No change in Plaintiff's prescription of Omeprazole was made, but NP Liefer recommended that Plaintiff consume about 20-35 g of fiber and drink about 64 oz of water per day.  (Tr. 680).

On March 19, 2021, Plaintiff underwent a psychological evaluation by the provider, Andrew Russell, M.D., after a reported suicide attempt.  (Tr. 699).   The claimant tied a purse strap around her neck, tied the purse strap to a metal bar by her window, and the strap broke.   (Tr. 699).   Plaintiff was evaluated by a crisis evaluator and agreed to inpatient treatment.  (Tr. 701). The next day, Plaintiff met with attending physician Gautam Datta, M.D., and discussed possible treatments after her suicide attempt.   Dr. Datta recommended a treatment plan including admitting Plaintiff into the inpatient psychiatric unit of the Gateway Regional Medical Center for stabilization, possible medication management, and placing Plaintiff on appropriate precautions. (Tr. 732-735).  She was discharged on March 22, 2021, after going to groups and medications were administered.  (Tr. 1347, 1349).   She was prescribed Lamictal and Minipress.  (Tr. 1349).

On May 7, 2021, Plaintiff returned to Dr. Datta and reported some continuing issues with anger and difficulty being around others, although she was able to walk, during which she had less anxiety.  (Tr. 1356-1357).   Later that month, Plaintiff reported to Dr. Datta that she was doing badly with significant anxiety.  (Tr. 1361).  Dr. Datta restarted her prescription of Xanax.  (Tr. 1363).

Dr. Datta completed a Medical Source Statement on August 2, 2021.  (Tr. 1119-1120). Dr. Datta opined Plaintiff would miss four days per month and be off task 25% or more during the work.  (Tr. 1119).  Dr. Datta additionally opined Plaintiff had mild to moderate limitations in

10

understanding and memory, mild to marked limitations in sustained concentration and persistence, mild to extreme limitations in social interaction, and moderate to extreme limitations in adaption. (Tr. 1120).

On August 23, 2021, Plaintiff reported to Dr. Datta that she was "good," but "not too much," she was still "not wanting to socializ[e]" but "would like to socialize more."  (Tr. 1390-1391).  She was medication compliant, Dr. Datta continued her medication and noted she was participating in therapy once or twice per week.  (Tr. 1391).  The next month, Dr. Datta discontinued Plaintiff's Xanax and prescribed Ativan, and noted she wasn't socializing much. (Tr. 1366).

On September 1, 2021, Plaintiff returned to NP Brit for a follow-up of projectile vomiting for the past two weeks.  (Tr. 1062).  Although she had stopped vomiting, she had daily nausea and heartburn and was prescribed Omeprazole and Zofran.  (Tr. 1062, 1066).  Similarly, on October 19, 2021, Plaintiff presented to Sujata Sitaula, M.D., with nausea and multiple episodes of vomiting.  (Tr. 1140-1141).

### Analysis

**Reliability of Plaintiff's subjective allegations**

Plaintiff first argues that the ALJ failed to support her assessment of Plaintiff's subjective reports of nausea and vomiting due to her gastrointestinal impairments. This is, in essence, an attack on the ALJ's assessment of Plaintiff's reliability as to her subjective statements of nausea and vomiting.

SSR 16-3p, effective as of March 28, 2016, supersedes the previous SSR on assessing the reliability of a claimant's subjective statements.   2017 WL 5180304, at *1.   SSR 16-3p requires

the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529, which include, among others, the claimant's daily activities, "the type, dosage, effectiveness, and side effects of any medication" taken to alleviate the symptoms, and other treatment or measures used for relief of the symptoms.   2017 WL 5180304, at *10.   It eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character."   2017 WL 5180304, at *10.   It does not purport to change the standard for evaluating the claimant's allegations regarding her symptoms.   Thus, prior Seventh Circuit precedents continue to apply.   Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support."   *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)).   The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.   *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).   However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible."   *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005) (citation omitted).   The "lack of medical evidence supporting the severity of a claimant's symptoms is insufficient, standing alone, to discredit her testimony." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) (citation omitted).

Plaintiff argues that, while the ALJ was correct in noting that Plaintiff's symptoms of nausea and vomiting improved with dietary adjustments and medication, her conclusion failed to explain how Plaintiff's reported three days of symptoms per month were inconsistent with the record.   (Doc. 15 at 11).   Plaintiff incorrectly states that the ALJ's analysis of Plaintiff's

12

gastrointestinal symptoms was limited to a single sentence.   The ALJ noted in the relevant

section:

> In regard to her gastritis, the claimant reported significant nausea and vomiting in
> September of 2019 (Exhibit 6F/7), but by the next month, stated that her symptoms
> were greatly improved and stable after making modifications to her diet (Exhibit
> 6F/13). After reporting persistent diarrhea in December of 2019 (Exhibit 3F/22),
> the claimant underwent a colonoscopy which showed no abnormalities (Exhibit
> 3F/24) and was diagnosed with gastroenteritis (Exhibit 3F/23). A gastroenterologist
> prescribed her Viberzi (Exhibit 4F/3). The claimant claimed she experienced
> projectile vomiting three times per week in January of 2021 (Exhibit 14F/1); her
> doctor diagnosed her with GERD and prescribed medication (Exhibit 14F/6), which
> improved her vomiting and heartburn (Exhibits 17F/3, 20F/1).   The claimant noted
> some nausea and no vomiting by March of 2021 (Exhibit 19F/1), and an upper GI
> was negative (Exhibit 33F/33). However, her claims of nausea (and a brief bout of
> vomiting) had returned by September of 2021 after she stopped taking Omeprazole
> (Exhibit 33F/3). The claimant's primary care provider resumed her prescription of
> Omeprazole (Exhibit 33F/7), and her symptoms were again stable in November of
> 2021 (Exhibit 37F/5).
> . . .
>
> Additionally, medication has improved the claimant's symptoms of nausea per her
> own report, and a colonoscopy and upper GI were normal.

(Tr. 33, 35).

The ALJ's cited summary of Plaintiff's medical record supports a finding that Plaintiff's

nausea and vomiting symptoms were alleviated with dietary adjustment and proper medication.

Plaintiff's argument that parts of the medical record were consistent with her allegations of

significant nausea and vomiting three days per month is merely an invitation for this Court to

impermissibly reweigh the evidence and does not render the ALJ's determination patently wrong.

Further, contrary to Plaintiff's contention, the ALJ's failure to cite Plaintiff's daily

activities record as it pretraining to her nausea and vomiting symptoms does not provide a ground

for reversal.   It is true that the ALJ noted that "claimant's statements about the intensity,

persistence, and limiting effects of her symptoms" were "inconsistent with the objective evidence

contained in the entire case record, the statements and other information provided by medical sources and others, as well as the relevant evidence in the claimant's case record, including but not limited to the claimant's reports of activities of daily living, measures taken to alleviate her symptoms, and the location, duration, frequency, and intensity of her symptoms (*see* 20 CFR 404.1529 and 416.929)."  However, this excerpt does not exclusively pertain to Plaintiff's gastritis but also to other reported symptoms relating to her diabetes, psychiatric condition, and vision impairments.   (Tr. 32-5).   There is nothing to indicate that the ALJ relied on inconsistencies with Plaintiff's reported daily activities in finding her testimony unpersuasive specifically as to the intensity, persistence, and limiting effects of her reported nausea and vomiting.   Accordingly, the failure to pinpoint the specific portion of Plaintiff's daily activities report that was inconsistent with Plaintiff's testimony is not ground for reversal.

Next, Plaintiff argues that the ALJ relied on a mischaracterization of the results of Plaintiff's colonoscopy as "normal" to support her analysis of Plaintiff's nausea.   (Doc. 15 at 12). It is true that the ALJ referenced the "normal" results of Plaintiff's colonoscopy twice in the section of her decision discussing Plaintiff's residual functional capacity.   First, discussing Plaintiff's gastritis, the ALJ noted that "[a]fter reporting persistent diarrhea in December of 2019 (Exhibit 3F/22), the claimant underwent a colonoscopy which showed no abnormalities (Exhibit 3F/24)." (Tr. 33).   The ALJ later in the same section noted that "medication has improved the claimant's symptoms of nausea per her own report, and a colonoscopy and upper GI were normal."   (Tr. 35).

As with the reference to Plaintiff's daily activities reports, however, the ALJ's references to the colonoscopy do not show that the ALJ relied on its "normal" findings to discredit Plaintiff's testimony specifically as it pertains to the severity and frequency of Plaintiff's nausea.   In fact, a

more careful review of the decision and the record supports the conclusion that the ALJ referenced the "normal" findings of colonoscopy to address Plaintiff's complaints of diarrhea and loss of weight—not those of nausea and vomiting.   On November 11, 2019, Plaintiff reported to Dr. Gould, with complaints of chronic diarrhea and weight loss.   (Tr. 476, 489).   Dr. Gould diagnosed Plaintiff with "gastroenteritis and colitis" and ordered a colonoscopy with biopsy due to Plaintiff's reports of chronic diarrhea and weight loss.   (Tr. 475-476, 489, 491 (emphasis added).   At the report of the colonoscopy, Dr. Gould noted in his findings that "[t]he colon was examined and no abnormalities were seen."   (Tr. 476).   At the biopsy report, which is not referenced or cited in the ALJ's decision, Dr. Gould made the following findings: "nonspecific mild chronic colitis, mildly reactive collateral mucosa with mild chronic inflammation and intramucosal edema, and a few eosinophils in the inflammation."   (Tr. 479).   In his pathology report, which is also not cited in the ALJ's decision, Dr. Gould listed as Plaintiff's final diagnosis "RANDOM COLON, ENDOSCOPIC BIOPSY: - NONSPECIFIC MILD CHRONIC COLITIS." (Tr. 492).   In a letter regarding those findings, Dr. Gould noted that the colonoscopy "revealed no gross abnormalities and biopsies were negative for any classic form of microscopic colitis, showing only some mild nonspecific inflammation." (Tr. 491).   Notably, Dr. Gould added to the letter: "I should add that when I performed her colonoscopy, she mentioned that she is more concerned about her nausea than anything else.   Actually she had only mentioned that briefly when I saw her in the office.   At any rate, if those symptoms persist, I will consider testing for H. pylori or perhaps an ultrasound or EGD."   (Tr. 491).   The ALJ did acknowledge Plaintiff's diagnosis of mild chronic colitis but found that it was not a severe impairment and that the record did not reflect it persisted following the prescribed medication.   (Tr. 27, 33).   Contrary to

Plaintiff's contention, even assuming that the ALJ mischaracterized the results of the colonoscopy, nothing in the ALJ's decision shows that ALJ relied on those "mischaracterized" results to disregard Plaintiff's reports of nausea or vomiting.

Therefore, the ALJ's assessment of Plaintiff's subjective reports of nausea and vomiting due to her gastrointestinal impairments is being supported by substantial evidence.

**2. The ALJ failed to properly assess the medical opinion of the treating psychiatrist, Dr. Datta.**

For her second point, Plaintiff challenges the ALJ's assessment of Dr. Datta's medical opinion as unpersuasive.   (Doc. 15 at 14-18).   She first argues that the ALJ failed to provide any reasons for discounting the moderate limitations opined by Dr. Datta.   Further, she argues that the ALJ discounted Dr. Datta's marked and extreme limitations relying on a selective reading of the record and substituting her judgment for that of the medical professionals.

An ALJ must consider the following factors when evaluating the medical opinion from a medical source: supportability; consistency; relationship with the claimant, including the length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and examining relations; specialization; and any other factors that tend to support the medical opinion, including evidence that the medical source is familiar with other medical evidence or has an understanding of social security policies.   20 C.F.R. §§ 404.1520c(c), 416.920c(c).   The most important factors are the supportability and consistency of the opinion.   20 C.F.R. §§ 404.1520c(a), 416.920c(a).   Although the ALJ must consider all of these factors, she need not discuss each factor in her opinion; the ALJ needs to discuss only the supportability    and    consistency    factors.       20    C.F.R.    §§    404.1520c(b),    416.920c(b).    "Supportability measures how much the objective medical evidence and supporting explanations

presented by a medical source support the opinion," while "consistency assesses how a medical opinion squares with other evidence in the record." *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022) (citing 20 C.F.R. §§ 404.1520c(b)(1), (2)). A minimal articulation of the ALJ's reasoning for assessing a medical opinion will suffice so long as the ALJ considers the regulatory factors and "builds a logical bridge from the evidence to [her] conclusion." *See Angie S. v. Kijakazi*, 21 C 5978, 2022 WL 17093363, at *6 (N.D. Ill. Nov. 21, 2022) (citation and internal quotation marks omitted).

**Moderate Limitations**

Plaintiff argues that the ALJ discredited Dr. Datta's opinion as to Plaintiff's moderate limitations without providing sufficient evidence in support of her assessment, including an analysis of the supportability factors set forth in 20 C.F.R. §§ 404.1520c, 416.920c. It is true that Social Security Ruling 96–8p requires that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling 96–8p; *see also Huber v. Astrue*, 395 Fed. Appx. 299, 302 (7th Cir. 2010). As correctly pointed out in the Commissioner's brief, however, the regulation governing an ALJ's evaluation of medical opinions provides that an ALJ may consider medical opinions provided by one medical source as a whole "in a single analysis" and need not "articulate how [she] considered each medical opinion or prior administrative medical finding from one medical source individually." 20 C.F.R. § 404.1520c(b)(1). Because, as set forth below, the Court finds that the ALJ properly articulated the regulatory factors in assessing Dr. Datta's determination as to the marked and extreme limitations as unpersuasive, any failure to specifically discuss those factors as they pertain to Plaintiff's moderate limitation is not a ground for reversal. *See, e.g.*, *Sawyer S. v. Kijakazi*,

320CV00277RLYMPB, 2022 WL 2392937, at *8 (S.D. Ind. June 13, 2022), *report and recommendation adopted*, 320CV00277RLYMPB, 2022 WL 2392203 (S.D. Ind. July 1, 2022) (rejecting the plaintiff's argument that ALJ erred in assessing persuasiveness of a medical provider's opinion discussing some but not all of its findings and noting that "the regulations specifically provide for a source-level articulation and not how the ALJ considered each medical opinion from one medical source individually.")

Plaintiff further relies on the ALJ's "failure" to discuss Dr. Datta's opined moderate limitations along with her statement that a finding of "no more than moderate limitations in her 'B' criteria is supported" to infer that the ALJ did not find Dr. Datta's opined moderate limitations unsupported.   He goes on to argue that the ALJ's decision should be reversed because the ALJ did not articulate the reasons for not adopting those supported limitations in the RFC, as required under SSR 96–8p.[4]   Plaintiff's reliance on the ALJ's statement that Plaintiff "had no more than moderate limitations in her 'B' criteria" to conclude that the ALJ found Dr. Datta's moderate limitations supported is misplaced.   A review of the decision as a whole illustrates that the ALJ's statement referred to the broad functional areas described as "B criteria" and not to each individual function (*e.g.*, ability to understand and remember very short and simple instructions) that Dr. Datta considered within those broad functional areas.[5]   This is evident by the ALJ's assessment of Dr. DiFonso's and Dr. Cools's medical opinions, where the ALJ noted that the Plaintiff has "moderate limitations in all 'B' criteria *areas*." (Tr. 37 (emphasis added)). Because the ALJ

---

[4] Plaintiff suggests the following inconsistency between the RFC and Dr. Datta's opined moderate limitations allegedly triggers the ALJ's duty under SSR 96-8p: Dr. Datta opined she had a moderate limitation in her "ability to understand and remember very short and simple instructions" and the mental RFC requires Burchett to be able to perform simple, routine tasks.   (Doc. 15 at 15).

[5] Notably, in evaluating Plaintiff's understanding and memory, Dr. Datta opined that Plaintiff had moderate limitation on her ability to understand and remember very short and simple instructions but mild limitation in her ability to understand and remember detailed instructions.   (Tr. 119-1120).

sufficiently articulated the reasons for which she found Dr. Datta's opinion unpersuasive at a source level, the ALJ did not have a duty to specifically address Dr. Datta's opined moderate limitations.

**Marked and Extreme Limitations**

*Supportability of Dr. Datta's medical opinion*

Plaintiff next challenges the ALJ's disregard of the marked and extreme limitations in Dr. Datta's opinion as being unsupported by substantial evidence.   (Doc. 15 at 15).   Plaintiff claims the ALJ's general citation to Dr. Datta's medical record as a whole, and without any further articulation, was insufficient to support her finding that Dr. Datta's opined extreme and marked limitations were unsupported.   (Tr. 39 "In any event, I do not find this statement to be persuasive, as the marked and extreme limitations noted are not supported by Dr. Datta's own records of the claimant's treatment (Exhibit 39F)").   The Court finds Plaintiff's argument unpersuasive in light of the ALJ's prior detailed analysis of Plaintiff's mental health record, which included numerous citations to Dr. Datta's medical notes substantially supporting the ALJ's assessment.

It is well established that the "ALJ's decision must be read as a whole."   *William L. v. Comm'r of Soc. Sec.*, No. 3:19-cv-993-GCS, 2020 WL 4582590 (S.D. Ill. Aug. 10, 2020).   "An ALJ need not rehash every detail each time he states conclusions on various subjects."   *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021).   Here, as noted in the Commissioner's brief, the ALJ cited Dr. Datta's examinations to show that Plaintiff's memory was intact, she was cooperative with treatment providers, her concentration and attention span were normal, she was alert and appropriately oriented, and she was appropriately well-groomed.   (Tr. 29-30, 37, 38, 1344, 1349, 1379).   The ALJ also cited Dr. Datta's adjustments to Plaintiff's treatment regimen in the fall of

2021, noting Plaintiff's report that she was feeling "good" in September 2021 after Dr. Datta adjusted her medication.  (Tr. 35, 1369).  The ALJ explained in her decision that, in October 2021, Dr. Datta restarted Plaintiff on Xanax and discontinued Ativan, and that thereafter she reported in October 2021 that she was doing well.  (Tr. 35, 1370, 1373).  The ALJ also cited Dr. Datta's December 2021 treatment note, where Plaintiff reported stress, but her mental examination was normal except for an anxious and sad mood, Plaintiff told Dr. Datta she had a boyfriend who made her feel safe and a support network with friends, and he prescribed Zoloft and started tapering her Xanax.  (Tr. 35, 1378-80).  Taken together, those treatment notes and examinations provide a "'meaningful analysis' that bears directly on the supportability and consistency" of Dr. Datta's medical opinion regarding Plaintiff's mental limitations.  *Angie S. v. Kijakazi*, 21 C 5978, 2022 WL 17093363, at *7 (N.D. Ill. Nov. 21, 2022) (citation and internal quotation marks omitted). Plaintiff also points to portions of Dr. Datta's medical record that allegedly support his opinion on the marked and extreme limitations.  Given the ALJ's aforementioned meaningful analysis of Dr. Datta's medical record, however, Plaintiff's argument is merely an impermissible invitation for the Court to reweigh the evidence.  The Court declines to do so.

*Consistency of Dr. Datta's medical opinion*

Plaintiff further raises a two-fold challenge to the ALJ's disregard of Dr. Datta's opinion regarding marked and extreme limitations on Plaintiff's "B" criteria.  First, she claims that the ALJ relied for her conclusion on portions of Plaintiff's medical record that are unrelated to her psychiatric health, such as finger pain, emergency room visits for sore throat, gastrointestinal symptoms, and diabetes, among other physical conditions.  (Doc. 15 at 16, citing Tr. at 453, 457, 461, 498, 506, 525, 547, 693, 792, 822, 957, 979, 1125, 1132, 1324).  Plaintiff relies on *Derrick*

*C. v. Comm'r of Soc. Sec.*, 3:21-CV-498-NJR, 2022 WL 3868062, at *8 (S.D. Ill. Aug. 29, 2022), where the court reversed the ALJ's conclusion that a medical opinion was unsupported because the ALJ had greatly relied on medical records unrelated to the plaintiff's mental health and the cited record was silent as to the plaintiff's condition for a period close to three years.

Unlike in *Derrick*, here, the ALJ supported her conclusion with citations to a significant number of mental status examinations and records by healthcare providers without significant chronological gaps.  While it is true that the ALJ cites, in part, to mental status examinations involving treatment for physical conditions, the ALJ has also included sufficient references to mental status examinations for mental health treatment.   (*See, e.g*, 541, 556, 561, 730, 768, 773, 779, 879, 943).

Next, Plaintiff cites to mental status examinations revealing that Plaintiff was irritable, anxious, depressed, and had poor insight and restricted affect (Doc. 15 at 17) as well as to the Patient Health Questionnaire tests conducted during the cited appointments to argue that the record supported a finding of a "moderately severe to severe mental" depression.   However, Plaintiff's cited authority predominantly goes to Plaintiff's diagnosis of major depressive disorder, which has not been disputed by the ALJ, and which the ALJ found to be a severe impairment under step 2. (Tr. 27).   Rather, the ALJ found Dr. Datta's opinions unsupported as to the effects that Plaintiff's mental diagnosis had on her functions considered under the paragraph "B" criteria.   A diagnosis of major depressive disorder, while generally warrants a finding of a severe impairment under step 2, is not conclusive of a finding of marked or extreme limitations on paragraph "B" criteria under step 4.  *See, e.g.*, *Ileana D. v. Saul*, 19-CV-3882, 2020 WL 5253840, at *3 (N.D. Ill. Sept. 3, 2020) (finding that the ALJ erred in finding the claimant's diagnosis with major depression was not a

severe impairment in light of *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016), but nonetheless concluding this was not a reversible error because the ALJ properly analyzed claimant's functional limitations under step 4, finding only mild limitations in one functional domain and no limitations in the remainder); *Davis v. Berryhill*, 723 F. App'x 351, 356 (7th Cir. 2018) (finding that the ALJ erred in determining that a claimant's depression was not severe at step two, but that error was harmless because the ALJ proceeded with her analysis and found plaintiff had only mild limitations in the four "Paragraph B" criteria for mental functioning).

Contrary to Plaintiff's claim, the Court cannot conclude that the ALJ did not consider the record as a whole in reaching her conclusion.  The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it."  *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).   Here, the ALJ noted that Plaintiff's mental status examinations were "*predominantly* normal but for mild mood and affects symptoms," which indicates that the ALJ reviewed and considered examinations in the record showing less than normal mental status or more than mild symptoms.  (Tr. 39, citing 1F/3-4, 8, 6F/21, 14F/4) (emphasis added).   Because the ALJ sufficiently articulated her finding as to the consistency of Dr. Datta's opinion with the medical record as a whole, Plaintiff's citation to other portions of the record to support an opposite conclusion is an invitation for improper weighing of evidence.

Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence.

*Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).   This is not a case in which the ALJ failed to discuss evidence favorable to the plaintiff or misconstrued the medical evidence.   Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence and do not provide a sufficient reason to overturn the ALJ's conclusion.

<u>Conclusion</u>

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED: March 29, 2024**

_s/_ *Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**